# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

––––––––––––––––––

**No. ACM 39220**

––––––––––––––––––

**UNITED STATES**
*Appellee*

**v.**

**Alfredo J. GONZALES**
Master Sergeant (E-7), U.S. Air Force, *Appellant*

––––––––––––––––––

Appeal from the United States Air Force Trial Judiciary

Decided 14 February 2019

––––––––––––––––––

*Military Judge:* Shelly W. Schools (arraignment and motions); Marvin W. Tubbs, II (motions and trial).

*Approved sentence:* Dishonorable discharge, confinement for 35 years, and reduction to E-1. Sentence adjudged 29 October 2016 by GCM convened at Laughlin Air Force Base, Texas.

*For Appellant:* Major Mark C. Bruegger, USAF; Major Patricia Encarnación Miranda, USAF; Jeffery King, Esquire.[1]

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Amanda L.K. Linares, USAF; Major G. Matt Osborn, USAF; Mary Ellen Payne, Esquire.

Before HUYGEN, MINK, and POSCH, *Appellate Military Judges*.

Senior Judge HUYGEN delivered the opinion of the court, in which Judge MINK and Judge POSCH joined.

––––––––––––––––––

––––––––––––––––––

[1] Mr. King filed the initial assignments of error and was then released by Appellant. Major Encarnación Miranda filed motions and was released by Appellant after he released Mr. King.

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

HUYGEN, Senior Judge:

Appellant pleaded and was found guilty by a military judge sitting as a general court-martial of two specifications of failure to obey a lawful order and one specification of willful dereliction of duty; two specifications of false official statement; and one specification of larceny, in violation of Articles 92, 107, and 121, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 907, 921. Contrary to Appellant's pleas, the military judge found him guilty of one specification of false official statement; three specifications of rape; five specifications of assault consummated by a battery; and one specification each of obstruction of justice and unlawful entry, in violation of Articles 107, 120, 128, and 134, UCMJ, 10 U.S.C. §§ 907, 920, 928, 934.[2] The military judge sentenced Appellant to a dishonorable discharge, confinement for 35 years, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

Appellant raises on appeal[3] and through counsel five issues: (1) whether Specifications 2 and 3 of Charge III should be set aside in light of *United States v. Mangahas*, 77 M.J. 220 (C.A.A.F. 2018); (2) whether the military judge erred by admitting evidence of an uncharged 2006 sexual assault to show propensity under Mil. R. Evid. 413 for a charged 2015 rape; (3) whether the evidence is factually and legally sufficient to support Appellant's convictions of offenses involving JH, AG, and CP; (4) whether the military judge erred by failing to award Appellant credit for illegal pretrial punishment; and (5) whether the failure of the staff judge advocate's recommendation (SJAR) to describe correctly Appellant's pretrial confinement warrants relief in the

————————————

[2] Appellant pleaded and was found not guilty of one specification of rape.

[3] Appellant initially raised five assignments of error (AOE), three of which—AOE III, IV, and V—were personally raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). After the original AOE were filed, Appellant released his civilian counsel, Mr. King, and military counsel, Major Encarnación Miranda. The court allowed the substitution of a new military appellate defense counsel and the filing of supplemental AOE. The supplemental filing did not further discuss AOE I and II but did re-frame AOE III and IV, no longer raising them pursuant to *Grostefon*. The supplemental filing also raised nine new AOE, eight of which were filed pursuant to *Grostefon*. The opinion addresses AOE III–XIV as they were discussed in the supplemental filing.

form of new post-trial processing. We also considered the issue of timely appellate review.

Appellant raises nine issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982): (1) whether Appellant's Fifth Amendment[4] rights were violated when he was ordered to provide the password for his cellphone; (2) whether Appellant was denied due process of law because the Government failed to adequately investigate the allegations and appoint a defense investigator and improperly influenced the testimony of witnesses; (3) whether the trial defense counsel were ineffective by insufficiently cross-examining JH; (4) whether the trial defense counsel were ineffective by insufficiently highlighting the reasons for the convening authority to grant clemency; (5) whether the military judge erred by not compelling the appointment of a confidential investigator for the Defense; (6) whether the military judge erred by allowing the Government to offer Mil. R. Evid. 404(b) evidence through "unreliable" witnesses; (7) whether the trial defense counsel were ineffective by not introducing specific evidence to support a Mil. R. Evid. 412 motion; (8) whether the military judge erred by prohibiting the Defense from introducing previously excluded evidence to impeach JH during sentencing; and (9) whether the military judge erred by not applying the "constitutionally required" exception to a Mil. R. Evid. 513 motion.[5] We considered the nine issues raised pursuant to *Grostefon* and find they warrant no further discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

We determine the evidence is factually insufficient to sustain the convictions for the rape of JH in 2006 and 2007 charged as Specifications 2 and 3 of Charge III, set aside the findings of guilt of the two specifications, and reassess the sentence. We also determine Appellant is entitled to credit for illegal pretrial punishment for a portion of the period of his pretrial confinement at Joint Base San Antonio-Lackland, Texas (Lackland). Finding no other prejudicial error, we affirm the remaining convictions and sentence as reassessed.

---

[4] U.S. CONST. amend. V.

[5] Related to the last three assignments of error filed pursuant to *Grostefon*, the trial transcript, appellate exhibits, and briefs addressing the particular evidence and matters were sealed pursuant to Rule for Courts-Martial (R.C.M.) 1103A. These portions of the record and briefs remain sealed, and any discussion of sealed material in this opinion is limited to that which is necessary for our analysis. *See* R.C.M. 1103A(b)(4).

## I. BACKGROUND

Appellant was initially investigated in February 2013 for government travel card misuse and eventually convicted in October 2016 of willful dereliction of duty for using his government travel card for unofficial purposes on divers occasions from 2011 to 2013. He was also found guilty of other offenses related to his financial entitlements: stealing approximately $12,000 in basic allowance for housing (BAH) from 2010 to 2011 and signing false official records concerning BAH in 2010, family separation allowance in 2010, and travel in 2012. During the investigation of Appellant's financial misconduct, JH, at the time his dependent spouse, was interviewed and provided information, some of it false, but made no allegation of any abuse by Appellant.

Appellant and AG were engaged in an intimate relationship that began in 2012 and had been living together in Del Rio, Texas, since 2013. During an argument with AG in March 2015, Appellant called the local police. The police and, later, Appellant's first sergeant responded to the house where Appellant, AG, and Appellant's daughter lived. Shortly after the incident, AG moved out of the house. Appellant was issued two orders not to contact AG and temporarily restricted to Laughlin Air Force Base (AFB), Texas, first in March 2015 for 5 days and then from March 2015 to May 2015 for 55 days. Nonetheless, Appellant and AG maintained contact and had an on-again, off-again relationship until August 2015 when AG told Appellant not to visit her in Lubbock, Texas. Appellant still came to AG's apartment, refused to leave, and prevented AG from leaving. After the confrontation, AG contacted security forces at Laughlin AFB and reported that Appellant had threatened and abused her during their relationship and had raped her in June 2015.

During the initial March 2015 investigation of Appellant's physical abuse of AG and the later August 2015 investigation of his sexual abuse of AG, JH was interviewed and alleged that, during her marriage to Appellant, he physically and sexually abused her on multiple occasions ("hundreds of times") from 2006 through 2010. JH and Appellant grew up together in a small town in Texas, married in 1993, and had two children. They periodically lived apart beginning in 2005 when they were having marital difficulties and JH took their children and moved from Maryland back to Texas. They also did not live together while Appellant was assigned to Korea and Honduras. In 2009, Appellant, JH, and their children were living together in New Mexico when JH again took the children and moved back to Texas. JH never again lived with Appellant, although they maintained contact and occasionally reunited and engaged in consensual sexual activity until they divorced in 2014.

Investigators also interviewed CP, who had an intimate relationship with Appellant from 2009 through 2012. CP alleged that Appellant physically

abused her during their relationship. Appellant ended the relationship after CP suffered a stroke.

At trial in 2016, Appellant was convicted of raping JH in 2006 and 2007 but acquitted of raping her in 2009. He was also convicted of raping AG in 2015. He was found guilty of physically assaulting CP in 2011 and 2012 and AG in 2013 and twice in 2015. In addition, he was found guilty of service-discrediting conduct by unlawfully entering CP's home in 2011 or 2012 and conduct prejudicial to good order and discipline by obstructing justice in 2015 when he promised AG financial compensation if she declined to participate in his court-martial. He was also found guilty of violating the two orders not to contact AG on divers occasions in 2015.

## II. DISCUSSION

### A. Statute of Limitations for Rape

Appellant asserts that the 2015 charges for raping JH in 2006 and 2007, Specifications 2 and 3 of Charge III, are barred by the five-year statute of limitations and should be set aside in light of *United States v. Mangahas*, 77 M.J. 220 (C.A.A.F. 2018). We reject Appellant's assertion and instead conclude there was no time limitation on Appellant being charged with and tried for raping JH in 2006 and 2007.

#### 1. Law

"The applicable statute of limitations is a question of law, which we review de novo. An accused is subject to the statute of limitations in force at the time of the offense." *Id.* at 222 (citations omitted). At the time of the charged rapes of JH that allegedly occurred in June 2006 and May 2007, the UCMJ's statute of limitations stated, "A person charged with . . . rape . . . may be tried and punished at any time without limitation." Article 43(a), UCMJ, 10 U.S.C. § 843(a) (2006).

#### 2. Discussion

The United States Court of Appeals for the Armed Forces (CAAF) used *Mangahas* to examine its decision in *Willenbring v. Neurauter*, 48 M.J. 152 (C.A.A.F. 1998). Overruling *Willenbring*, the CAAF determined that rape was not an "offense punishable by death" for the purpose of the 1994 iteration of Article 43, UCMJ, which set no time limitation on trying such an offense and which was in effect at the time of Mangahas' 1997 alleged rape of a fellow cadet at the United States Coast Guard Academy. *Mangahas*, 77 M.J. at 221–22. As a result, the five-year statute of limitations in force at the time of Mangahas' 1997 offense barred his 2015 charge for rape. *Id.* at 225.

5

We need not address the question of rape as an "offense punishable by death," although *Mangahas* still informs our review of the statute of limitations in Appellant's case. As noted by the CAAF in *Mangahas*, acknowledged by Appellant, and relied on by Appellee, Congress amended Article 43, UCMJ, with the National Defense Authorization Act for Fiscal Year 2006 (FY06 NDAA), Pub. L. No. 109–163, § 552–53, 119 Stat. 3136, 3264 (2006). *Mangahas*, 77 M.J. at 222 n.2. In particular, Section 553 of the FY06 NDAA added rape as a specific offense that "may be tried and punished at any time without limitation." *See* Article 43(a), UCMJ, 10 U.S.C. § 843(a) (2006).

Appellant is correct to point out that Section 552 of the FY06 NDAA also amended Article 43, UCMJ: it added "rape of a child" as an offense that could be tried at any time. Appellant also accurately states that Section 552 specified an effective date of 1 October 2007, whereas Section 553 included no specific effective date. Appellant then recognizes the presumption that, "where a section is silent on the effective date, the amendment becomes effective on the date of publication, in this case, January 6, 2006."

More than a presumption, it is a rule of statutory construction that, unless specified otherwise, the effective date of a federal law is the date it is enacted, or signed by the President. *See Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) (citations omitted). The FY06 NDAA, including Section 553, was signed and thus effective on 6 January 2006, which was approximately five months before Appellant's earliest charged rape of JH. As a result, at the time of Appellant's rape of JH in June 2006 and in May 2007, the statute of limitations in effect allowed Appellant to be tried for the offenses "at any time without limitation." *See* Article 43(a), UCMJ, 10 U.S.C. § 843(a) (2006).

## B. Uncharged Misconduct as Evidence of Propensity

Appellant next contends that the military judge erred by admitting evidence of an uncharged 2006 sexual assault of JH to show propensity under Mil. R. Evid. 413 for the charged 2015 rape of AG. Although we find error by the military judge, we find no resulting prejudice to Appellant.

### 1. Additional Background

JH testified about the 2006 sexual assault by Appellant. According to JH, she had returned to Maryland in 2006 to retrieve items belonging to her and her two children as Appellant was moving out of the house the four had lived in together until 2005. While the movers were inside the house, which was one of four attached rowhouses, JH went outside and sat at a picnic table on the back porch. Appellant came outside, put his hand in her hair, and sat on the table in front of her. He unbuttoned his pants, pulled out his penis, called her "wh[**]e" and "b[**]ch," told her to "suck [his] d[**]k," and forced his penis into her mouth. JH testified that she did not say anything and could not

6

pull away because of his hand in her hair. She also could not stand up because of their respective positions at the picnic table. After Appellant ejaculated, he went back inside the house. She sat at the table for about an hour and cried, feeling "embarrassed and ashamed" because she knew the movers "had seen what was going on," but she did not tell anyone what had happened until she described the incident to investigators in 2015.

AG described the 2015 rape by Appellant as follows: Appellant and AG had been living apart since March 2015 but had maintained contact and seen each other occasionally when, in June 2015, they met to spend a weekend together at a hotel in Lubbock, Texas. Although they kissed and slept in the same bed during the weekend, they did not have sex. On Monday morning, AG woke up to get ready to leave and Appellant was "trying to kiss [her] and touch on [her]." Appellant moved on top of AG and started pulling down her pajama pants while she repeatedly said "no" and "stop." She tried to push him away at the same time he tried to push apart her legs. He was eventually able to separate her legs and force his penis inside her vagina. After he finished having sex with her, he stayed in bed. She got up, showered, dressed, and left. According to AG, when Appellant called her later that day, he apologized and asked her not to tell anybody; she did not report the incident until August 2015.

The Government sought to admit evidence of the uncharged 2006 sexual assault of JH under Mil. R. Evid. 404(b) for multiple purposes and under Mil. R. Evid. 413 to show Appellant's propensity to commit sexual assault. There was extensive motions practice and several hearings. In the final ruling on the issue, the military judge admitted the evidence under Mil. R. Evid. 413 without addressing Mil. R. Evid. 404(b).

### 2. Law

A military judge's decision to admit evidence is reviewed for an abuse of discretion. *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (citation omitted). Mil. R. Evid. 413(a) provides that, in a court-martial for a sexual offense, "the military judge may admit evidence that the accused committed any other sexual offense. The evidence may be considered on any matter to which it is relevant." This includes using evidence of a sexual assault to prove the accused has a propensity to commit sexual assault. *United States v. James*, 63 M.J. 217, 220 (C.A.A.F. 2006).

In *United States v. Wright*, the CAAF articulated three "threshold findings" that a military judge must make before admitting evidence under Mil. R. Evid. 413: (1) the accused is charged with an offense of sexual assault; (2) the evidence proffered is evidence of his commission of another sexual assault; and (3) the evidence is relevant under Mil. R. Evid. 401 and Mil. R.

Evid. 402. 53 M.J. 476, 482 (C.A.A.F. 2000) (citations omitted). "Additionally, the Court must apply a balancing test under [Mil. R. Evid.] 403." *Id.*

> In conducting the [Mil. R. Evid.] 403 balancing test a military judge should consider the following factors: the strength of the proof of the prior act; the probative weight of the evidence; the potential to present less prejudicial evidence; the possible distraction of the fact-finder; the time needed to prove the prior conduct; the temporal proximity of the prior event; the frequency of the acts; the presence of any intervening circumstances; and the relationship between the parties.

*United States v. Berry*, 61 M.J. 91, 95 (C.A.A.F. 2005) (citing *Wright*, 53 M.J. at 482). While "inherent in [Mil. R. Evid.] 413 is a general presumption in favor of admission," the evidence "may be excluded if its 'probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members.'" *Id.* (quoting Mil. R. Evid. 403) (additional citation omitted).

### 3. Discussion

At issue on appeal is the military judge's admission under Mil. R. Evid. 413 of the uncharged 2006 sexual assault, specifically, penetration of JH's mouth with Appellant's penis without JH's consent, to show Appellant's propensity to commit the charged 2015 rape of AG. We note that Appellant does not challenge on appeal the admission of the uncharged assault to show propensity for the charged rape of JH in 2009, 2007, or 2006, the last allegedly occurring 8 to 10 hours after the uncharged assault.

The military judge who ultimately convicted and sentenced Appellant issued a written ruling on the Defense's motion to limit evidence the Government sought to have admitted under Mil. R. Evid. 404(b) and Mil. R. Evid. 413. Referencing the law articulated in Mil. R. Evid. 413, *Berry*, and *Wright* as well as the balancing test of Mil. R. Evid. 403, the military judge found that the uncharged 2006 sexual assault of JH made more or less likely a fact of consequence—whether Appellant had a propensity to commit sexual assault—and thus was relevant. The military judge acknowledged that the 2006 incident occurred only once, that being nine years before the 2015 incident, but pointed to the similarity between JH and AG: each was Appellant's intimate partner at the time of the incident involving her. Finding that the evidence of the 2006 incident, namely, JH's testimony, would not take much time and presented little potential for distraction or confusion, the military judge determined that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice to Appellant and admitted

it "to show propensity to commit sexual offenses under Mil. R. Evid. 413 for all charged Article 120 specifications." We reach a different conclusion.

We are unconvinced that the sole proof of the 2006 sexual assault—JH's testimony detailed above—was strong; that there was much probative value of the 2006 sexual assault relative to the 2015 rape; or that the uncharged assault—which allegedly involved Appellant's penetration of JH's mouth with his penis, occurred outdoors and within view and hearing of others, and involved no physical or verbal resistance by JH—was unlikely to distract or confuse a factfinder assessing the charged rape in a hotel room of AG who was resisting vaginal penetration both physically and verbally. We also deem more significant than did the military judge the temporal distance between the 2006 sexual assault and the 2015 rape and the relationship difference between JH and AG: in 2006 JH had been married to Appellant for 13 years whereas in 2015 AG had been involved in an intimate relationship with Appellant for 3 years. Finally, we determine that the probative value of the uncharged 2006 sexual assault of JH to show Appellant's propensity under Mil. R. Evid. 413 to rape AG in 2015 was substantially outweighed by the dangers of unfair prejudice and confusion of the issues.

Although the military judge erred by admitting the uncharged 2006 sexual assault of JH to show Appellant's propensity to commit the 2015 rape of AG, the error did not prejudice Appellant. "A finding or sentence of a court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused." Article 59(a), UCMJ, 10 U.S.C. § 859(a). "For a nonconstitutional error such as this one, the Government has the burden of demonstrating that 'the error did not have a substantial influence on the findings.'" *Berry*, 61 M.J. at 97 (quoting *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003)) (additional citation omitted). "In evaluating whether erroneous admission of Government evidence is harmless, this court uses a four-part test, weighing: (1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *Id*. at 98 (citation omitted).

We first find that the Government's case that Appellant raped AG in 2015 was strong. AG's testimony about her rape was solid and supported by Appellant's admission and apology in text messages he sent to AG, albeit at her prompting. We also considered that, even if the uncharged 2006 incident involving JH had not been admitted under Mil. R. Evid. 413 to show propensity for the charged 2015 rape of AG, it would have been admitted under Mil. R. Evid. 404(b) for non-propensity purposes as was evidence of other uncharged incidents involving JH. The Government described those non-propensity purposes as Appellant's "hostility towards the women in his life when they do

disobey him," "a common plan of controlling [JH] and subjugating her to his will," and Appellant's pattern of abuse of his intimate partners.

Secondly, we find that the Defense's case, which relied on undermining AG's credibility and highlighting that she did not report the rape until over two months later, she continued the relationship with Appellant, and she used his financial resources, was weak. Furthermore, we find the materiality and quality of the evidence of the uncharged 2006 sexual assault of JH with respect to the 2015 rape of AG was low, particularly given the distance in time and dissimilarities in facts and circumstances between the two incidents. Thus, we conclude the military judge's error in admitting under Mil. R. Evid. 413 the uncharged 2006 sexual assault of JH to show Appellant's propensity to rape AG in 2015 neither had a substantial influence on the findings nor materially prejudiced the substantial rights of Appellant.

## C. Factual and Legal Sufficiency

Appellant challenges the factual and legal sufficiency of Appellant's convictions of offenses involving CP, AG, and JH, specifically, the two physical assaults of CP and the unlawful entry of CP's house, the 2015 rape and three physical assaults of AG, and the 2006 and 2007 rape of JH. We find factually and legally sufficient the convictions involving CP and AG but find the convictions for raping JH in 2006 and 2007 factually insufficient.

### 1. Law

We review issues of legal and factual sufficiency de novo. Article 66, UCMJ, 10 U.S.C. § 866; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence presented at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements [of the crime] beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the accused's guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. In conducting this unique appellate role, we take "a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington*, 57 M.J. at 399. We apply "neither a presumption of innocence nor a presumption of guilt" but "assess the evidence

in the entire record . . . [to] make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Id.* "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

**2. Discussion**

At trial and on appeal, Appellant challenged CP's memory and the unlikelihood of the facts underlying her claims; AG's credibility and the unlikelihood of the facts underlying her claims; and JH's credibility and the unlikelihood or impossibility of the facts underlying her claims.

### *a. Offenses Involving CP*

### *i) Assault Consummated by Battery*

For Appellant to be found guilty of assault consummated by a battery of CP in violation of Article 128, UCMJ, the Government had to prove beyond a reasonable doubt the following elements:

(1) Appellant did bodily harm to CP, and

(2) The bodily harm was done with unlawful force or violence by pushing her with his hands in April 2011 in California and by punching and slapping her on her face and lips with his hands in January 2012 in Texas. *See Manual for Courts-Martial, United States*, pt. IV, ¶ 54.b.(2) (2012 ed.) (2012 *MCM*).[6]

To constitute an assault, the act "must be done without legal justification or excuse and without the lawful consent of the person affected." 2012 *MCM*, pt. IV, ¶ 54.c.(1)(a). "'Bodily harm' means any offensive touching of another, however slight." *Id.*

Testifying at Appellant's trial in 2016, CP conceded that her stroke in 2012 continued to cause problems with her "short term memory." She did not recall correctly all the surrounding circumstances of the two alleged assaults by Appellant, such as where Appellant was stationed in 2011 when the Air Force sent him to California for "Air Force related" work. But she was able to remember the pertinent facts, which were supported by other evidence, for example, a government travel card statement that demonstrated Appellant was on temporary duty in California in April 2011. CP described the 2011 as-

---

[6] There was no relevant change from the 2008 *MCM* to the 2012 *MCM*. *See Manual for Courts-Martial, United States*, pt. IV, ¶ 54.b.(2) (2008 ed.) (2008 *MCM*).

11

sault in California as Appellant pushing her during an argument that led to her locking him out of their hotel room.

Regarding the 2012 assault in Texas, the Government witnesses included not only CP but also the front desk clerk, who unlocked the hotel lobby door and let in CP but not Appellant, and the two local police officers who responded after the clerk called emergency services. The witnesses' observations supported CP's account that, while she and Appellant were in the car and driving back to the hotel, Appellant hit her multiple times with significant force and she hit Appellant once. There was photographic evidence of the visible injuries to her face and hand. While the Defense raised a plausible argument of self-defense—during an argument in the car, CP hit Appellant who was driving and he had to fend her off—the military judge was not convinced and neither are we. Even if CP first hit Appellant and Appellant was initially defending himself, the severity of CP's multiple injuries and the absence of multiple or severe injuries to Appellant render Appellant's conviction for assault consummated by a battery of CP legally and factually sufficient.

### ii) Unlawful Entry

For Appellant to be found guilty of unlawful entry in violation of Article 134, UCMJ, the Government had to prove beyond a reasonable doubt the following elements:

(1) Appellant entered the dwelling home of CP,

(2) Such entry was unlawful, and

(3) Under the circumstances, the conduct of Appellant was of a nature to bring discredit upon the armed forces. *See* 2012 *MCM*, pt. IV, ¶ 111.b.

"An entry is 'unlawful' if made without the consent of any person authorized to consent to entry or without other lawful authority. No specific intent or breaking is required for this offense." *Id.* ¶ 111.c.

CP's roommate testified, and her description of Appellant's unlawful entry into the house she shared with CP corroborated CP's description of the incident. While CP had previously allowed Appellant into the house and had given him a key, she had since ended the relationship, at least temporarily, stopped communicating with him, and changed the locks on the doors to the house. On the night of the unlawful entry, Appellant came to the house, rang the doorbell and knocked, and, after CP and her roommate did not respond to his phone calls or text messages, came through the garage and into the house via a kitchen door that had a broken lock. Appellant refused to leave until CP talked with him. After the Government rested its case, the Defense moved under Rule for Courts-Martial (R.C.M.) 917 for a finding of not guilty and pointed to the Government's failure to prove that Appellant's conduct was

service-discrediting. The military judge found that it was; we agree. While neither CP nor her roommate testified whether she viewed Appellant's conduct as service-discrediting, we find, as did the military judge, that Appellant's unlawful entry as charged and described constituted "conduct which has a tendency to bring the service into disrepute or which tends to lower it in public esteem." 2012 *MCM*, pt. IV, ¶ 60.c.(3).

Considering the evidence in the light most favorable to the Prosecution, we determine that a reasonable factfinder could have found beyond a reasonable doubt all the essential elements of the offenses involving CP and that the evidence is legally sufficient to support Appellant's convictions. Having weighed the evidence in the record and made allowances for not having personally observed the witnesses, we also conclude the evidence is factually sufficient and are convinced of Appellant's guilt beyond a reasonable doubt.

### b. Offenses Involving AG

Appellant pleaded not guilty to all the offenses involving AG except the two specifications of failure to obey an order not to contact her but was found guilty of all of them. On appeal, he does not challenge his conviction for obstruction of justice by promising her financial support in exchange for her non-participation in his court-martial.

#### i) Rape

For Appellant to be found guilty of rape of AG in violation of Article 120, UCMJ, the Government had to prove beyond a reasonable doubt the following elements:

(1) Appellant committed a sexual act upon AG in June 2015 by causing penetration, however slight, of her vulva with his penis, and

(2) Appellant did so with unlawful force. *See* 2016 *MCM*, pt. IV, ¶ 45.b.(1).

Force includes "the use of such physical strength or violence as is sufficient to overcome, restrain, or injure a person." *Id.* ¶ 45.a.(g)(5). "'[U]nlawful force' means an act of force done without legal justification or excuse." *Id.* ¶ 45.a.(g)(6).

AG testified about all the charged offenses involving her, and her testimony included her account of the morning of June 2015 when Appellant raped her in a Texas hotel room. Additional evidence that the sexual act was rape came in the form of text messages AG and Appellant exchanged on 28 July 2015 over the course of two to three hours, including the following:

> [AG:] And what about my fear...
>
> [AG:] It's not my fault you raped me....

[Appellant:] I stayed with you almost an entire week there were no issues, I'm not trying to scare you or any way shape or form make you feel scared

. . . .

[AG:] I am disgusted.... I said no

[AG:] I pushed you away

[AG:] I begged you to stop

[AG:] And you blame me and act like it's ok because we had had sex before

[Appellant:] I never blamed anyone for anything

. . . .

[AG:] I mean you won't even admit it or apologize.... You just keep talking about shopping

[Appellant:] Look, I don't like texting about all this stuff! And again I'm sorry for that day! I [sic] was the most miserable day of our lives!

[AG:] Of my life... Your [sic] not the one who was violated

[Appellant:] I told you that day what happened was wrong and there were no excuses, none of that was your fault! Whatsoever!

[Appellant:] I'm sorry, I love you I don't feel comfortable texting about any of this!

. . . .

[Appellant:] But I understand your fear! I completely understand your agony! But that's not ever going to happen again. Even now when I touch you and you say no I immediately stop. Even the last time we had sex, I was scared nervous and tense because I didn't want to hurt you in any way!

[Appellant:] Again I'm sorry! Nothing was your fault! And that will never ever happen again.

The exchange quoted above was clearly initiated and directed by AG in order to have Appellant admit his wrongdoing. The texts came in the context of communications in which both Appellant and AG willingly engaged until August 2015 when AG told Appellant not to visit her and he did anyway. Meanwhile, AG had Appellant rent an apartment for her, provide her a power of attorney so that she could access his financial accounts, and send her a

debit card for his bank account. While AG's actions might cause one to question her motive for reporting the June 2015 rape in August 2015, they do not undermine the credibility of the report.

### ii) Assault Consummated by Battery

For Appellant to be found guilty of assault consummated by a battery of AG in violation of Article 128, UCMJ, the Government had to prove beyond a reasonable doubt the following elements:

(1) Appellant did bodily harm to AG, and

(2) The bodily harm was done with unlawful force or violence by pushing, dragging, and throwing her on the floor and ground with his hands in October 2013; by grabbing and squeezing her hands, face, and cheeks with his hands in January 2015; and by shoving and scratching her arms, chest, neck, and face with his hands in March 2015. *See* 2012 *MCM*, pt. IV, ¶ 54.b.(2).

To constitute an assault, the act "must be done without legal justification or excuse and without the lawful consent of the person affected." *Id.* ¶ 54.c.(1)(a). "'Bodily harm' means any offensive touching of another, however slight." *Id.*

All the charged incidents of physical assault of AG, like the charged physical assaults of CP and the uncharged physical assaults of JH, occurred during an argument with Appellant. In October 2013, AG tried to end an argument by going to sleep. Appellant picked her up off the bed, threw her on the floor, and dragged her out of the house they shared. She went to a neighbor's house and called the police, who advised her to move out. After she had done so, Appellant contacted her and convinced her to return. AG's mother, RR, testified that, after Appellant dragged AG out of the house, Appellant called RR and told her to "come get" AG whom he had "put outside."

In January 2015, AG and Appellant were arguing when AG held up her hand to indicate she was not listening to him. To stop her from ignoring him, he grabbed her face and squeezed it. After he left the room, she went to the bedroom of his daughter, SG, in order to use SG's phone to call the police. Once AG had SG's phone, Appellant removed it from AG's hand by bending back her thumb and prying it out. SG, who is developmentally disabled, corroborated the incident insofar as it involved her and her phone.

AG's testimony about the argument of March 2015 was also corroborated in part by SG. Appellant and AG were arguing when AG decided to go to SG's bedroom. In a futile attempt to prevent AG from waking up SG, who heard a "loud banging" on her door, Appellant pushed AG out of the house while she resisted. As noted above, Appellant called the local police, who came to the house, as did Appellant's first sergeant, Master Sergeant (MSgt) AA. MSgt

AA testified about his observations of the argument's aftermath, including AG's visible injuries, which were also documented in photographs.

Considering the evidence in the light most favorable to the Prosecution, we determine that a reasonable factfinder could have found beyond a reasonable doubt all the essential elements of the offenses involving AG and that the evidence is legally sufficient to support Appellant's convictions. Having weighed the evidence in the record and made allowances for not having personally observed the witnesses, we also conclude the evidence is factually sufficient and are convinced of Appellant's guilt beyond a reasonable doubt.

### c. Offenses Involving JH

#### i) Rape

For Appellant to be found guilty of rape of JH prior to 1 October 2007 in violation of Article 120, UCMJ, the Government had to prove beyond a reasonable doubt the following elements:

(1) Appellant committed an act of sexual intercourse in June 2006 in Maryland and in May 2007 in Texas and

(2) The act of sexual intercourse was done by force and without consent. *See* 2005 *MCM*, pt. IV, ¶ 45.b.(1).

> Force and lack of consent are necessary to the offense. . . . The lack of consent required, however, is more than mere lack of acquiescence. If a victim in possession of his or her mental faculties fails to make lack of consent reasonably manifest by taking such measures of resistance as are called for by the circumstances, the inference may be drawn that the victim did consent. Consent, however, may not be inferred if resistance would have been futile, where resistance is overcome by threats of death or great bodily harm, or where the victim is unable to resist because of the lack of mental or physical faculties. In such a case there is no consent and the force involved in penetration will suffice.

*Id.* ¶ 45.c.(1)(b).

Appellant pleaded not guilty to the three charged offenses of rape of JH in 2006, 2007, and 2009 and was acquitted of the last. JH testified about the three charged offenses of rape and uncharged incidents of physical assault, the first of which occurred in 1993 after she married Appellant. JH described their relationship as involving more frequent arguments once Appellant joined the Air Force in 1995, but, other than the 1993 incident, the abuse was only verbal until February 2006.

In 2005, JH had taken their two children and left Appellant in Maryland. They returned to Maryland in February 2006 when JH and Appellant tried to reconcile. Driving home from the airport, they began an argument that continued in the house where, according to JH, Appellant choked her until she vomited blood. Their son called the police, whose appearance stopped the assault. JH testified that she told her family about the incident, and SG testified that she recalled an argument between her parents that led to her brother calling the police.

JH described the next uncharged incident of physical assault as occurring in Texas in April 2006. During an argument outside Appellant's parents' house, Appellant pushed JH, "slammed" her head into a car seat, and threw her car keys at her, hitting her leg and bruising it. She returned to her parents' house and told her father about the incident, and he took her to the police to report it. According to JH, Appellant threatened to "take" their children from her as he had in the past when she reported or planned to report his abuse. She went back to the police and told them that she had "made up" the allegation and her bruise was caused by "rough sex." As a result, she was convicted of filing a false police report.

In June 2006, Appellant was preparing to move from Maryland to Korea for a change of assignment, so JH returned to Maryland for the move. The alleged incident of uncharged sexual assault (Appellant's penetration of JH's mouth with his penis without her consent) occurred on the back patio while the movers were inside the house. That night, JH was getting ready to sleep on an air mattress in the now-empty house. JH described the rape as follows: Appellant pushed her onto the mattress. She thought he was going to hit her. He got on top of her, held her hands above her head, and bound her wrists together with a scarf. She was trying to get away, crying, and screaming at him to stop. He blindfolded her by tying another scarf over her eyes and was cursing at her. He spit in her face, called her names, penetrated her vagina with his penis, and, after he ejaculated, untied the scarves, turned over, and went to sleep. She cried for a while but stayed on the mattress. The next day, they drove to Texas. JH did not tell anybody about the incident and did not discuss it with Appellant. Called by the Defense, the Air Force Office of Special Investigations (AFOSI) agent leading the investigation of the rape allegations, Special Agent SM, testified that AFOSI confirmed Appellant moved in 2006 but did not identify or interview the movers.

After Appellant moved to Korea, JH visited him there. He physically assaulted her twice during the six-week visit.

In May 2007, Appellant returned to Texas from Korea for a 30-day visit during which he, JH, and their children stayed at his parents' house. His parents hosted a party in his honor. According to JH, Appellant became an-

17

gry because she was talking to JM, a male cousin of Appellant. Appellant and JH began to argue at the party when he grabbed her arm and "dragged" her into the bedroom they were sharing. Once in the bedroom, he slapped her, threw her down on the bed, sat on her, raised her arms above her head, and bound her wrists together with wire. She was screaming, so he turned on loud music. There was also music playing at the party. She struggled by kicking her feet but he "ripped off" her clothes, penetrated her vagina with his penis, and, after he finished, got dressed and returned to the party. She went to the bathroom to clean the blood that was "all over [her] face" and then returned to the bedroom. She did not tell anybody about the incident and continued to share the bedroom with Appellant until he returned to Korea. Called by the Defense, JM and two other male cousins of Appellant remembered parties in Appellant's honor and at Appellant's parents' house during the relevant time frame. None of the three remembered anything "unusual" involving JH or any injury to JH. Special Agent SM testified that AFOSI did not visit Appellant's parents' house, interview or attempt to interview Appellant's parents, or identify or interview any attendees of the party.

By the time Appellant was reassigned to New Mexico, he and JH had decided to reconcile again, so JH and their two children moved in with Appellant, at which point there was more physical abuse of JH by Appellant. In January 2009, there was a birthday party for Appellant. During the nighttime party, JH found Appellant outside with another woman, CW, and Appellant and JH began to argue. While they argued, the partygoers left and their daughter, SG, woke up. JH went to lie down with SG in SG's bedroom and fell asleep there. JH woke up when Appellant dragged JH into the living room where he lifted her up with his hands around her throat and slammed her into the corner. He took her into their bedroom, threw her on the bed, held her wrists above her head, ripped off her clothes, and forced her to have sex with him. She was struggling but did not scream so as not to scare SG. Afterwards, he stayed in the bedroom but she went to the living room where SG was sitting on the couch. She slept with SG in SG's bedroom and did not report the incident. SG testified that she remembered an incident in which her father pulled her mother out of SG's bed. SG did not remember seeing her mother again that night. Called by the Defense, CW's husband, Technical Sergeant JW, testified that CW was not and could not have been at the party in January 2009 because she deployed that month and he did not remember any such party before she left. Special Agent SM testified that AFOSI did not visit the house that was the scene of the alleged crime or interview any attendees of the party, including CW. The military judge found Appellant not guilty of this allegation of raping JH in 2009.

On the issue of JH's credibility, she described the circumstances that led to her conviction for filing a false police report for alleging Appellant's physi-

cal abuse in April 2006. She also explained that, in 2010 while Appellant was assigned to Honduras, she contacted his chain of command and complained that he was not providing financial support for his children. When he found out, he became angry and had her send an email saying that she had lied in exchange for a financial payment. According to JH, she again lied to Air Force authorities at Appellant's behest in 2013. Under investigation for stealing money by claiming more than his lawful entitlement for BAH, Appellant told her to tell the investigating AFOSI agents that she and their children were living in Maryland when they had actually been living in Texas. Not only did JH do as Appellant requested but she talked with AFOSI without reporting any instance of physical or sexual abuse.

JH alleged that Appellant repeatedly threatened to take their two children from her. Other than her testimony, there was no evidence that he ever did so or attempted to do so. JH testified that, in 2013, JH sent SG to live with Appellant (and AG) because SG was being bullied at the school she attended while living with JH.

Considering the evidence in the light most favorable to the Prosecution, we determine that a reasonable factfinder could have found all the essential elements of the offenses involving JH beyond a reasonable doubt and that the evidence is legally sufficient to support Appellant's convictions. However, we ourselves are not convinced beyond a reasonable doubt and conclude the evidence is not factually sufficient.

JH had a significant credibility issue that was demonstrated by her conviction for filing a false police report as well as her two admissions to lying to Air Force officials when she either lied to protect a monetary benefit (financial support for dependents or BAH) or lied about lying.

Notwithstanding the issue of JH's credibility, we do not doubt that Appellant's pattern of physical abuse of his intimate partners began with JH. While JH did not report most of Appellant's physical abuse until 2015, there was some evidence to corroborate that Appellant had a history of battering JH. JH's allegations of physical abuse were also more believable because they included acknowledgements that JH was sometimes the instigator or the initial assailant. Additionally, the instances of physical abuse by Appellant of JH fit the larger pattern of physical abuse by Appellant of his intimate partners, including CP and AG. All three women engaged in relationships with Appellant in which he and his intimate partner employed verbal and physical abuse but in which both people chose to stay for at least several years.

The clear pattern of Appellant's physical abuse of his intimate partners also makes it more apparent that there was no similar pattern of sexual abuse, especially in the context of frequent arguments that included verbal

abuse and led to physical abuse. Despite the multiple proven incidents when an argument between Appellant and AG led to physical violence, AG made only one allegation of rape and described a single instance of sexual intercourse that undeniably involved force and was done without consent in that Appellant used his greater weight and strength to hold down AG and penetrate her vagina with his penis. However, Appellant did not engage in physical violence, meaning he did not hit, bite, or choke AG; Appellant was not acting in anger; and the rape did not occur in the context of an argument. And even though there was more than one proven incident of physical violence by Appellant against CP during an argument, CP made no allegation of sexual violence.

The evidence did not support JH's claim that Appellant raped her in 2009 during an argument that began when JH found Appellant with CW. After testimony that CW was deployed at the relevant time, Appellant was found not guilty of the charge. Although there was not similar evidence to contradict a material fact of JH's accounts of rape in 2006 and 2007, we find the evidence does not support those claims because the Government did not present sufficient evidence to prove the offenses.[7] Regarding the rape during the party in 2007, we considered that not even the person who was the alleged cause of that night's argument, JM, remembered talking to JH, noticing anything unusual with JH, or observing any injury to JH. Not only did the Government not call (or even interview) Appellant's parents, who would have seen JH the morning after Appellant "backhanded" her so hard her face was bloody, but the Government did not call JH's parents or sister, who were living in the same small town and may have observed evidence of such a significant injury. Regarding the rape during the move in 2006, we considered that the Government did not call (or even identify) the movers who JH believed saw and heard the nonconsensual oral sex earlier in the day. The Government also did not call any neighbor who lived in an attached rowhouse and may have observed something relevant to either the sexual assault or the

---

[7] We note the irony of Appellee's response to one of the *Grostefon* issues in which Appellee argues the investigation of JH's allegations of rape was sufficient considering that the crimes being investigated "had occurred *years* prior." That argument underlies a point relevant here: a "sufficient" investigation of a crime that occurred years before could render the case insufficient at trial when the Government bears the burden of proof beyond a reasonable doubt. Although the charges of rape of JH in 2006 and 2007 are not barred by the statute of limitations, the substantive legal justification for a statute of limitations provides context for this case, and the near decade-long temporal distance between the offenses and their investigation and prosecution significantly impaired not only the Defense but also the Government.

rape JH alleged as occurring that day or may have remembered something of the February 2006 physical assault that ended when the police responded.

The two charged rapes by Appellant of JH in 2006 and 2007 fail the test for factual sufficiency. Having weighed the evidence in the record and made allowances for not having personally observed the witnesses, we are not convinced of Appellant's guilt beyond a reasonable doubt. Even when we take into account that the military judge saw and heard the witnesses, especially JH, we assess that the evidence in the record is insufficient to affirm Appellant's convictions for raping JH in 2006 and 2007.

### ii) Sentence Reassessment

Because we set aside the findings of guilty to Specifications 2 and 3 of Charge III, we consider whether we can reassess the sentence. We have "broad discretion" first to decide whether to reassess a sentence and then to arrive at a reassessed sentence. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). To determine whether to reassess a sentence or order a rehearing, we consider the totality of the circumstances, including the following factors: (1) "Dramatic changes in the penalty landscape and exposure;" (2) "Whether an appellant chose sentencing by members or a military judge alone;" (3) "Whether the nature of the remaining offenses capture[s] the gravamen of criminal conduct included within the original offenses and . . . whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses;" and (4) "Whether the remaining offenses are of the type that judges of the courts of criminal appeals should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial." *Id.* at 15–16 (citations omitted). If we can determine to our satisfaction that, "absent any error, the sentence adjudged would have been of at least a certain severity, then a sentence of that severity or less will be free of the prejudicial effects of error." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986).

We have considered the totality of the circumstances and find that the factors weigh in favor of reassessment rather than rehearing. Although we are setting aside significant offenses, specifically, two specifications of rape, our decision does not change the penalty landscape or Appellant's exposure. He remains convicted of one specification of rape, and rape remains the most serious offense of which he was found guilty. His maximum punishment still includes confinement for life without eligibility for parole and a mandatory minimum of dishonorable discharge. Furthermore, Appellant chose sentencing by a military judge alone. We find that the nature of the remaining numerous offenses capture the gravamen of criminal conduct included with the original offenses. We further find that significant and aggravating circumstances addressed at the court-martial, in particular, Appellant's pattern of

physical abuse of his intimate partners, remain admissible and relevant to the remaining offenses. In addition, the remaining offenses, which range from rape to willful dereliction of duty, are of the type with which we have the experience and familiarity to reliably determine what sentence would have been imposed at trial. Therefore, we reassess a sentence of a dishonorable discharge, confinement for 20 years, and reduction to the grade of E-1.

## D. Pretrial Confinement as Illegal Pretrial Punishment

Appellant asserts, as he did at trial, that he should receive credit for illegal pretrial punishment, specifically, the 374 days of pretrial confinement at the Lackland military confinement facility, where he was classified and treated as a "maximum security" detainee. We agree in part.

### 1. Background

After the incident between Appellant and AG in March 2015, Appellant was restricted to Laughlin AFB for five days as of 13 March 2015. By the time Appellant's commander received information that indicated Appellant had not remained on base during the period of restriction, Appellant and SG had moved back into Appellant's off-base house so that SG could get to school. Appellant's commander reinstated the restriction but adjusted it, and, for 55 days as of 27 March 2015, Appellant was restricted to base during duty hours, Monday through Friday. On 18 August 2015, after AG reported that Appellant had raped her in June 2015, he was placed in pretrial confinement. He was confined first in the Val Verde County (Texas) Confinement Facility from August 2015 through October 2015 and then in the Lackland military confinement facility. He remained in pretrial confinement for a total of 437 days, 63 in the Val Verde County facility and 374 in the Lackland facility, until he was sentenced on 29 October 2016. The military judge awarded 437 days of pretrial confinement credit but no credit for illegal pretrial punishment.

### 2. Law

> Our determination of whether [an appellant] endured unlawful pretrial punishment involves both constitutional and statutory considerations. We defer to the findings of fact by the military judge where those findings are not clearly erroneous. However, our application of those facts to the constitutional and statutory considerations, as well as any determination of whether [an appellant] is entitled to credit for unlawful pretrial punishment involve independent, de novo review.

*United States v. King*, 61 M.J. 225, 227 (C.A.A.F. 2005) (citations omitted). In *King*, the CAAF expounded on Article 13, UCMJ:

> The first prohibition of Article 13 involves a purpose or intent to punish . . . and whether such purposes are "reasonably related to a legitimate governmental objective." The second prohibition of Article 13 prevents imposing unduly rigorous circumstances during pretrial detention. Conditions that are sufficiently egregious may give rise to a permissive inference that an accused is being punished, or the conditions may be so excessive as to constitute punishment.

*Id.* at 227–28 (quoting *Bell v. Wolfish*, 441 U.S. 520, 539 (1979)) (additional citations omitted).

Article 13, UCMJ, 10 U.S.C. § 813, prohibits (1) pretrial punishment or penalty other than pretrial confinement and (2) pretrial confinement "any more rigorous than the circumstances required to insure [the confinee's] presence" other than minor punishment for infractions of discipline while confined. R.C.M. 305(k) allows a military judge to "order additional credit for each day of pretrial confinement that involves an abuse of discretion or unusually harsh circumstances."

**3. Discussion**

On 21 December 2015, the Defense first moved for relief for illegal pretrial punishment based on the conditions of Appellant's pretrial confinement. His initial and subsequent motions were framed as a two-fold request for (1) release and (2) credit. On 10 March 2016, the noncommissioned officer in charge (NCOIC) of the Lackland facility provided telephonic testimony on the issue. In a written ruling, the military judge found the following:

- On 20 October 2015, Appellant was transferred to the Lackland confinement facility where he is a maximum security detainee.

- Appellant is a maximum security detainee solely because of his pretrial status and in accordance with Air Force Instruction (AFI) 31–105, *Air Force Corrections Systems* (15 Jun. 2015). As a maximum security confinee, he is not permitted to mingle with other confinees or access the open bay area and is normally segregated.

- He is confined to his cell 24 hours a day except for one hour of physical conditioning three days a week. He cannot see outside. His meals are brought to his cell. He has at least two and a half hours of unrestricted free time every day. He has access to a radio on a rotating basis and opportunities to watch movies. He is allowed to have visitors, make phone calls, and speak with staff members. When he leaves the facility for an appointment, he is shackled and escorted, including by at least one armed guard, and remains shackled unless medical personnel request otherwise during a medical appointment.

- AFI 31–105 requires all pretrial detainees to be classified as maximum security and dictates the conditions of maximum security. Appellant is treated the same as other pretrial detainees and maximum security prisoners. Although segregation can be disciplinary or administrative, Appellant is segregated solely because of his pretrial status. He is not in solitary confinement, which is disciplinary segregation and requires a prisoner to remain in his cell 100 percent of the time.

- The NCOIC was not aware of any formal grievance filed by Appellant about the confinement conditions, but Appellant had complained about his mattress and he was provided an additional one.

The military judge concluded (1) Appellant had not been punished prior to trial and there was no evidence of an intent to punish and (2) the conditions of his confinement were not more rigorous than necessary and served a legitimate government interest of compliance with Air Force regulation. The military judge therefore denied the Defense motion for credit for illegal pretrial punishment beyond the day-for-day credit Appellant would receive for pretrial confinement. *See United States v. Allen*, 17 M.J. 126 (C.M.A. 1984).

The military judge's findings of fact are not clearly erroneous, and, while we adopt them, we considered additional information provided by the NCOIC of the Lackland facility. Appellant could have been housed by himself in an open bay except those bays were occupied. As a result and because he was a maximum security detainee, he was kept physically segregated from all other detainees and housed in the segregation unit, even though he was not under administrative or disciplinary segregation. Unlike someone in administrative segregation, he was allowed to make personal phone calls, and, unlike someone in disciplinary segregation, he was allowed to leave his cell at specific times and for specific reasons, such as physical conditioning, and to interact with certain individuals, including all facility staff but no other detainees. While Appellant had "unrestricted free time" from 1830 hours Monday through Friday and from 1000 hours Saturday and Sunday until 2100 or 2200 hours, he still had to spend that time in his cell. Testifying again in August 2016, the NCOIC described Appellant's four documented minor infractions as a "very low number" and his behavior as overall "very positive."

We are left facing the same question the military judge asked:

> [W]hat it comes down to is -- am I supposed to just give deference to the Air Force who has decided this policy decision [to classify Appellant as maximum security only because he is a

> pretrial detainee and decide it] makes sense in a confinement
> setting and basically just defer to their thoughts on the matter?

We make an independent determination and decline to grant such deference.[8]

In *King*, the appellant was an Air Force member who was detained in pre-trial confinement at Barksdale AFB under conditions required by Air Force regulation. 61 M.J. at 226–28. The CAAF did not find that King's "maximum security" classification gave rise to an inference of an intent to punish; that the conditions of his pretrial confinement resulting from the classification were so excessive as to amount to punishment; or that his denied requests for release or downgraded classification or commingling with a post-trial inmate violated Article 13, UCMJ, or constituted punishment or unnecessarily rigorous conditions warranting additional credit. *Id*. at 228.

> However, we find that King was subjected to punishment dur-ing the two weeks he was in segregation . . . . in a six-by-six, windowless cell. . . . Placing King in a segregated environment with all the attributes of severe restraint and discipline, with-out an individualized demonstration of cause in the record, was so excessive as to be punishment and is not justified by the Barksdale AFB confinement facility space limitations.

*Id*. at 228–29 (citation omitted). As a result, King was awarded three days of administrative credit for each day of solitary segregation. *Id*. at 229.

In Appellant's case, we agree with the military judge that there was no purpose or intent to punish Appellant and that the conditions of Appellant's pretrial confinement related to a legitimate governmental objective of regulatory compliance. However, Article 13, UCMJ, has two prohibitions. In light of the second—the prohibition of pretrial confinement more rigorous than required to insure the confinee's presence—and *King*, we assess the conditions of Appellant's pretrial confinement at Lackland—although not solitary confinement, physical segregation in a cell for 23 or 24 hours a day without an individualized demonstration of cause—and deem them more rigorous than the circumstances required to insure Appellant's presence and so excessive as to be punishment. Thus, we award 300 days of credit for illegal pretrial pun-

---

[8] Military judges need no longer answer the question because AFI 31–105 has been amended: "Pretrial detainees are immediately classified as maximum custody for 72 hours or first duty day (whichever is later). This time is their acclimation period." AFI 31–105, ¶ 5.4.5 (15 Jun. 2015, as amended by Air Force Guidance Memorandum 2018–01, 26 Apr. 18). After the acclimation period, the detainee is classified as medi-um or maximum custody. *Id*. ¶ 5.4.5–5.4.5.1.

ishment for Appellant's period of pretrial confinement at Lackland from 21 December 2015 when Appellant first moved for relief until 29 October 2016 when his sentence was adjudged, less the 13 days of hearings during that period.[9]

## E. Error in Staff Judge Advocate's Recommendation

Appellant claims that the failure of the SJAR to describe correctly his pretrial confinement warrants relief in the form of new post-trial processing. We are not persuaded.

### 1. Additional Background

The SJAR itself did not say anything about Appellant's pretrial confinement. The Report of Result of Trial (RRT) attached to the SJAR indicated that Appellant was credited 437 days for pretrial confinement. The Personal Data Sheet (PDS) attached to the SJAR was a copy of the PDS admitted at trial, described "Nature of Pretrial Restraint," and included "Military Confinement, 18 Aug – Current".

The clemency submission from the trial defense counsel addressed "legal issues" in Appellant's case and included the denial of "any relief for unlawful pretrial punishment that [Appellant] had to endure while in pretrial confinement" but did not elaborate further. At the end of Appellant's request for clemency, he referenced his pretrial confinement in the context of asking the convening authority to set aside his convictions for offenses involving JH and wrote, "I have not caused any issues while at confinement even though I was being held in solitary confinement before I had a trial." Otherwise, both documents consisted almost entirely of discussing the offenses involving JH.

---

[9] *Cf. United States v. Jimenez*, No. ACM 39200, 2018 CCA LEXIS 304, at *30–33 (A.F. Ct. Crim. App. 20 Jun. 2018) (unpub. op.) (the military judge awarded 200 days of credit for illegal pretrial punishment because the appellant was held in pretrial confinement under maximum security conditions without the opportunity for reassessment; without stating whether it agreed with the military judge's findings, the court found the award a sufficient remedy and declined to grant further relief), *rev. denied*, 78 M.J. 121 (C.A.A.F. 2018); *United States v. Catano*, No. ACM 39092, 2018 CCA LEXIS 1, at *14–16 (A.F. Ct. Crim. App. 3 Jan. 2018) (unpub. op.) (the military judge granted 277 days of credit for illegal pretrial punishment because the appellant was arbitrarily held in maximum custody and unnecessary segregation while in pretrial confinement but declined to apply the excess confinement credit to the bad-conduct discharge; the court agreed, noting that setting aside the punitive discharge would be disproportionate to the harm suffered by Appellant), *rev. denied*, 77 M.J. 421 (C.A.A.F. 2018).

The addendum to the SJAR listed the seven errors the Defense alleged were committed by the military judge, ending with "denying relief for unlawful pretrial punishment." The SJA indicated he had considered the alleged errors and found them to be without merit. He recommended the convening authority approve the findings and sentence as adjudged.

The convening authority approved the adjudged findings and sentence.

**2. Law**

The proper completion of post-trial processing is a question of law the court reviews de novo. *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000) (citation omitted). Failure to comment in a timely manner on matters in the SJAR or matters attached to the SJAR waives any later claim of error in the absence of plain error. R.C.M. 1106(f)(6); *United States v. Scalo*, 60 M.J. 435, 436 (C.A.A.F. 2005). Analyzing for plain error, we assess whether "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *Scalo*, 60 M.J. at 436 (quoting *Kho*, 54 M.J. at 65) (additional citation omitted). "To meet this burden in the context of a post-trial recommendation error . . . an appellant must make 'some colorable showing of possible prejudice.'" *Id.* at 436–37 (quoting *Kho*, 54 M.J. at 65). "The threshold is low, but there must be some colorable showing of possible prejudice. . . . in terms of how the [error] potentially affected an appellant's opportunity for clemency." *Id.* at 437 (citation omitted).

**3. Discussion**

Appellant points to the PDS language of "Military Confinement, 18 Aug – Current" as error but concedes that he made no such claim during the post-trial processing of his case. By failing to comment on the now-claimed error in a timely manner, he forfeited the issue and, consequently, we analyze it for plain error. *See Scalo*, 60 M.J. at 436.

First, we agree with Appellee that there was no error. Article 60(e), UCMJ, 10 U.S.C. § 860(e), creates the requirement for an SJAR, and R.C.M. 1106(d)(3) describes its required contents, including "the report of results of the trial, setting forth the findings, sentence, and confinement credit to be applied." These requirements were satisfied in Appellant's case.

Secondly, if there was error with regard to the PDS, it was not obvious. The PDS is not per se required by Article 60, UCMJ, but R.C.M. 1106(d)(1) and R.C.M. 1107(b)(3)(B) both indicate that the convening authority may consider the "personnel records of the accused." Furthermore, it is well established Air Force practice that the PDS is attached to the SJAR and that the PDS attached is the PDS admitted at trial. *See* AFI 51-201, *Administration of Military Justice*, ¶ 9.16 (6 Jun. 2013). Attached to the SJAR in Appellant's case was the PDS dated 24 October 2016 and admitted at trial. It indicated

that Appellant had been in "Military Confinement" from "18 Aug" to "Current." When read in conjunction with the immediately preceding PDS references to "Restriction In Lieu of Arrest, 13 Mar 2015, Laughlin AFB, TX, 5 days" and "Conditions on Liberty, 27 Mar 2015, Laughlin AFB, TX, 55 days" and the RRT note of 437 days of pretrial confinement credit, the "18 Aug – Current" period of "Military Confinement" is more obviously understood to refer to 18 August 2015 than 18 August 2016. In addition, "Military Confinement" was not obviously wrong. Although Appellant was initially held at the civilian Val Verde County facility, his pretrial confinement was ordered by military authority based on the military's jurisdiction of Appellant and the violations of the UCMJ he was suspected of committing.

Finally, even if we assume *arguendo* that the PDS language of "Military Confinement, 18 Aug – Current" was error and the error was obvious, it did not materially prejudice a substantial right of Appellant, specifically, his right to have the convening authority consider his clemency request. It is documented in the record that the convening authority considered Appellant's request for clemency, which consisted almost entirely of a request to disapprove the findings of guilt of the offenses involving JH. Appellant did not ask for a reduction in confinement because of the length and location of his pretrial confinement or for any other reason. Still, the SJA duly informed the convening authority that he could not only disapprove the findings of guilt for all offenses but also "disapprove, commute, or suspend in whole or in part confinement, forfeitures, and reduction in rank." The convening authority chose not to do so. Therefore, we conclude there was no plain error to overcome Appellant's waiver of any SJAR issue and decline to grant relief.

### F. Timeliness of Appellate Review

We review de novo whether an appellant has been denied the right to due process and a speedy post-trial review and appeal. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006). A presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed before the court. *Id.* at 142. When a case is not completed within 18 months, such a delay is presumptively unreasonable and triggers an analysis of the four factors laid out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135.

Appellant's case was originally docketed with the court on 15 March 2017. The delay in rendering this decision after 15 September 2018 is presumptively unreasonable. However, we determine there has been no violation of Appellant's right to due process and a speedy post-trial review and appeal.

Analyzing the first two *Barker* factors, we find the length of the delay of five months is significant. The reasons for the delay include the size of the record of Appellant's trial—the 27 volumes include a trial transcript of almost 1,800 pages—and the time required for Appellant to file his original five assignments of error on 7 March 2018. The Government filed its answer on 5 April 2018. On 9 July 2018, Appellant submitted a motion to suspend the court's rules "to correct errors that have occurred" and informed the court that he had released his civilian appellate defense counsel in June 2018 and his original military appellate defense counsel in July 2018. The court granted the motion and allowed the substitution of a new military appellate defense counsel, who submitted on Appellant's behalf supplemental assignments of error, including nine not previously raised, on 30 August 2018. The Government answered on 24 October 2018. The court is issuing its opinion almost four months after the Government's answer to Appellant's supplemental assignments of error.

The third *Barker* factor was resolved on 3 July 2018. Appellant waived his "*Moreno* rights to a speedy appeal" with the understanding that, if the court granted his request to file supplemental assignments of error, the time to process his appeal would be "significantly extend[ed]."

We find that Appellant has not suffered prejudice from the delay in the appellate review of his case. Appellant began his 35 years of confinement on 29 October 2016, and the court is reassessing the sentence to 20 years of confinement. Moreover, he waived his right to a speedy (as defined by *Moreno*) review. With five additional months for appellate review, Appellant has received the assistance of a third appellate defense counsel and filed nine more assignments of error, which have been answered by the Government and considered by the court.[10]

Finding no *Barker* prejudice, we also find the delay is not so egregious that it adversely affects the public's perception of the fairness and integrity of the military justice system. As a result, there is no due process violation. *See United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In addition, we determine that, even in the absence of a due process violation, the delay does not merit relief. *See United States v. Tardif*, 57 M.J. 219, 223–24 (C.A.A.F.

---

[10] Our declining to grant relief should not be read as approval of the action or, more aptly, inaction by Appellant's original civilian and military appellate defense counsel to keep him informed about his appeal and to file *Grostefon* issues on his behalf. *See* Air Force Rules of Professional Conduct, Rule 1.4 (11 Dec. 2018); A.F. CT. CRIM. APP. R. 15.2.

2002). Applying the factors articulated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we find the delay in completing appellate review justified and relief based on the delay unwarranted.

### III. CONCLUSION

The findings of guilty to Specifications 2 and 3 of Charge III are **SET ASIDE** and Specifications 2 and 3 of Charge III are **DISMISSED WITH PREJUDICE**. We reassess the sentence to a dishonorable discharge, confinement for 20 years, and reduction to the grade of E-1. We also award Appellant 300 days of credit for illegal pretrial punishment. The remaining findings and the sentence as reassessed are correct in law and fact, and no other error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66, UCMJ, 10 U.S.C. §§ 859(a), 866. Accordingly, the remaining findings and sentence as reassessed are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court